Filed 6/4/25  P. v. Hammar CA4/1

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D085027 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. INF1901618) |
| JOSEPH ANTHONY HAMMAR, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Frederick Paul Dickerson III, Judge.  Affirmed.

Rachel Varnell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Michael J. Patty, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Joseph Anthony Hammar on 15 counts related to the sexual abuse of a minor, Jane Doe.  Hammar asserts the convictions must be overturned because the trial court and the prosecutor erred in allowing and presenting testimony about child sexual abuse accommodation syndrome

(CSAAS).[1] He argues routinely admitted expert testimony on CSAAS should be found inadmissible as unreliable; the frequently-used model jury instruction CALCRIM No. 1193 is legally erroneous; and the prosecutor improperly elicited additional CSAAS testimony from a lay witness.

We decline Hammar's invitation to depart from settled law finding that expert testimony on CSAAS and related topics is admissible under certain circumstances, and that CALCRIM No. 1193 is not legally erroneous. As to Hammar's remaining contention, the People concede, and we agree, that the prosecutor erred by eliciting additional testimony regarding the way in which children tend to disclose sexual abuse from the same social worker who conducted the forensic interview of Jane Doe. However, we conclude the error was not so prejudicial as to require reversal and therefore affirm the judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The abuse underlying this case originally came to light in 2011, when Jane's classmate and friend made a hotline report to Child Protective Services. Hammar was arrested and charged then, but Jane refused to testify so the case never went to trial.

In 2019, after Hammar filed a request to seal the previous records, a deputy district attorney contacted Jane. Jane agreed to pursue the case, and the People filed a new complaint in September 2019. Hammar learned of the

---

[1]    The expert here clarified that although it is historically referred to as CSAAS, it is not really a syndrome. The research focuses on "the nature of the relationship [involving] sex abuse among an adult and a minor known to one another." We refer to CSAAS throughout this opinion based on Hammar's presentation of the issues, but acknowledge it may be more appropriate to refer more generally to sexual abuse disclosure patterns.

2

new charges while in Vietnam and he stayed there until he was arrested and extradited back to the United States in August 2022.

In an information, filed November 1, 2022, the People charged Hammar with eight counts of oral copulation upon a child under 14 years of age (counts 1–8; Pen. Code § 269, subd. (a)(4));[2] four counts of sexual penetration of a child 14 years of age or older (counts 9–12; § 289, subd. (a)(1)(c)); and three counts of oral copulation upon a minor who is 14 years of age or older (counts 13–15; § 287, subd. (c)(2)(c)).

### A.    Prosecution's Case

#### 1.    Jane Doe

Jane testified that Hammar was in a relationship with her mother (Mother) and that he and Mother had a child together.  Jane previously lived with her grandparents but started living with Mother and Hammar in 2003.  Jane was about nine years old, and her half sister was an infant.  At the time, Jane referred to Hammar as her stepfather.

The abuse started when Hammar picked Jane up from a school trip in the fifth grade.  On the way home, Hammar pulled the car to the side of an empty road and parked.  He told Jane that he would teach her how to take care of a man, and then kissed her on the mouth, using his tongue.  He told her not to tell Mother and that doing so could hurt the family relations.  Jane did not tell Mother.

The next incident occurred in the home.  Mother and Hammar worked at a casino but worked opposite shifts, so they could share caring for their younger daughter.  Often, Mother would be at work and Hammar would be home in the afternoons when Jane returned from school.  One day, Hammar

---

2    Further unspecified statutory references are to the Penal Code.

3

took Jane into the bathroom attached to the master bedroom. He covered Jane's eyes with a shirt or a towel and forced his penis into her mouth. He put his hands on the back of her head and made her move forward and backward. Jane tasted a bitter liquid. This happened when Jane was in the fifth, sixth, and seventh grades. One time, the towel or shirt fell off and Jane saw Hammar's penis in front of her.

The abuse became more frequent when Jane was around 17 years old. Hammar was trying harder to insert his penis into Jane's vagina. One time, she "felt something go in slightly" and felt pressure around her vagina. On other occasions, Hammar inserted his tongue and his fingers into Jane's vagina. The increase in severity and frequency of the abuse upset Jane. She told two of her friends at school and eventually agreed to allow one of them to make a report.

Jane spoke with an investigator from the Palm Desert Sheriff's office at her high school on October 5, 2011. She participated in a pretext call with Hammar that same day. She told Hammar that she had a friend whose dad was abusing her and "it made me think about what you do with me." Hammar responded, "I know, I—I would like to say I'm very sorry and I wish it doesn't happen anymore." He continued, "that's why I've been trying to stay away from you." Hammar asked Jane to forgive him and to keep it to herself. Jane said that she thought she needed a counselor. Hammar begged her not to do that and said, "that could be disastrous for the whole—the whole family." Jane asked Hammar if he knew how many times "you did this," and he said, "a lot of times." Jane did not say the words sexual abuse or refer to any specific acts during the conversation. A recording of the call was played for the jury.

Jane had trouble speaking to the investigator about the details of the abuse but agreed to participate in a forensic interview. The interview occurred on October 12, 2011. Around the same time, Jane told the investigator that she wanted to drop the charges because everyone was suffering. She later told the prosecutor that she did not want to testify against Hammar because her "mom was having a difficult time," she felt like it was her fault, and she "just wanted it to end."

At trial, Jane disclosed that, in addition to the sexual abuse, Hammar also abused her physically and emotionally. He would punish her by making her kneel on the hard tile ground for hours. One time he placed a knife on a chair in front of her and forced her to hold her hands out over the knife while kneeling. Hammar called Jane names, like "fat, ugly, useless."

Jane often responded to questions, from both defense counsel and the prosecutor with, "I don't know." She said the abuse was traumatic and she purposefully tried not to remember.

### 2. Jane Doe's Mother

Mother confirmed that she and Hammar worked opposite schedules, and that Hammar was often home in the afternoons. She put a lock on Jane's bedroom door when Jane was in high school. Mother's sister had come to stay with them but left in the night because Hammar had come into the bedroom drunk. Mother was "sort of" concerned about Jane being home alone with Hammar but did not tell anyone about her concerns.

After Hammar's arrest, Mother and Jane went to his defense attorney's office where Hammar's mother was also present. Jane testified that Hammar's mother asked her to pretend like nothing happened and told Jane what to say when they met with Hammer's defense attorney.

Jane never told Mother about any sexual, physical or verbal abuse from Hammar. It was not a topic that she talked about.

### 3. Fresh Complaint Witnesses, S.L. and J.H.

S.L. met Jane when they were freshmen in high school and continued to have classes with her over the next few years. In 2010, when they were both juniors, Jane told S.L. that her stepfather was touching her inappropriately. S.L. asked if she could report it, but Jane asked S.L. not to tell anyone and said that she could handle it. About a year later, Jane told S.L. the incidents were getting worse and more frequent. Jane said that she was told they were a happy family but that she was not happy. S.L. again asked Jane's permission to report the abuse and, this time, Jane agreed. S.L. made a report through a website, but did not get a response, so she made a second report to a Child Protective Services victim hotline number that her mother provided.

J.H. also attended high school with Jane. J.H. recalled a day in math class, probably during their junior year. Jane was crying and said that her stepfather was doing something sexual to her. It was distressing to J.H. and she had trouble focusing on the details.

### 4. Sheriff Michael Judes

Child Protective Services cross-reported the hotline call from S.L. to authorities. That same day, October 5, 2011, Michael Judes, an investigator from the Palm Desert Sheriff's office, went to the high school to speak with Jane. Jane was extremely soft spoken and hard to hear at times. Judes recorded this initial interview, and the People played it for the jury.

In the recording, Jane stated that her stepfather had been "sexually harassing" her since she was in fifth grade. She said that it happened a little more than once a week, sometimes as often as every other day. She said that

6

he touched her over and under her clothing. Jane also expressed concern regarding what would happen and stated that she did not want her "family to split or anything." Judes asked Jane to conduct the pretext call with Hammar and she agreed. Following the pretext call, Jane was taken to the station for a more detailed interview.

Meanwhile, Judes's partner, Investigator Steins, went to the family home, detained Hammar and took him to the sheriff's station where Judes later conducted an interview with him. During the interview, Hammar was looking down at the ground, hanging his head and would not look at Judes.

Judes also conducted the second interview with Jane later that day, at the sheriff's station. Jane repeated that Hammar was sexually harassing her and explained that she meant he was touching her breasts and vagina, both over and under her clothes. She said that a few times, he put his fingers in her vagina, and at least once he tried to put his penis into her vagina. She reported a recent incident in which she was washing dishes at the sink. Hammar came up behind her and rubbed her breasts and buttocks. A week before that, Hammar placed her hand on his erect penis. A month before that, Hammar came into her bedroom, pulled her down to the end of the bed and forced his penis into her mouth.

Judes asked Jane to start from the beginning, and Jane told him about the time when Hammar picked her up from a field trip in fifth grade and kissed her in the car. At the conclusion of the interview, Judes asked Jane if she wanted to tell Mother. Jane declined.

Judes explained that Mother attended a forensic interview with Jane on October 12, 2011. However, her demeanor had changed from the week before. On October 5, she seemed concerned and wanted to know what had happened to Jane. On October 12, she was annoyed that the interview took

7

two hours and seemed like "she wanted to be done and over with the investigation."

Jane's demeanor also changed. She was initially cooperative but on October 11, 2011, she came to the station and told Judes that she wanted to drop the charges. When Judes asked her why, Jane said that everyone was suffering. Judes asked if anyone had been talking to her, and Jane responded that Hammar's mother had and that she "wants me to help him. . . by dropping it all." Still, Jane agreed to go forward with the forensic interview the next day.

### 5.    Jeremy Zazueta, Jail Investigations

Jeremy Zazueta is a senior correctional deputy. He testified regarding the jail call system and laid the foundation for the admission into evidence of the audio from several calls that were recorded between Hammar and his mother while Hammar was in jail. During the calls, Hammar asked his mother to remove certain items from the family home. She confirmed that she did so before the police searched the home. Hammar told his mother that they could not just say that nothing happened and suggested that Jane would have to be the one to say she was mad and angry and made it all up. Hammar said, "You have to tell your friend that it has to be said by her, 'OK, I was angry when I was young and old' for it to be alright. Other than that, no one else can change it."

### 6.    Denise Rodriguez Bowman, Forensic Interviewer

Denise Rodriguez Bowman is a social worker with extensive experience in forensic interviewing. At the time of trial, she had conducted between 700 and 1000 forensic interviews and testified as an expert between 40 and 60 times.

Bowman conducted a forensic interview of Jane on October 12, 2011. The interview was video recorded, and the People played it for the jury during Bowman's testimony.

Before playing the interview, Bowman discussed the forensic interview process in general and some details regarding how minors tend to disclose abuse. We discuss this testimony in more detail, *post*.

After playing the interview, Bowman explained some of the techniques she used with Jane. Bowman noted, when asked if she wanted to discuss anything else at the end of the interview, Jane said she wanted to drop the charges. Bowman asked Jane if what they talked about really happened, and Jane said "Yes, it did happen." Jane mentioned that Hammar made her mom smile, and that she did not want her sister to have to visit him in jail. Bowman explained that children sometimes struggle with these disclosures because they are thinking about their family members, and the family dynamic, over themselves.

### 7. Dr. Veronica Thomas, Expert Witness

Dr. Veronica Thomas is a clinical psychologist. She had been licensed in California for 38 years at the time of trial, and had taught abnormal psychology at University of California, Irvine for 18 years. She had worked with many victims of sexual abuse, including adults who had not previously disclosed the abuse. Dr. Thomas explained that sometimes children do not necessarily realize that it is abuse, at least not until later. If they do disclose, it is often accidental.

Dr. Thomas had never met Jane and had not received any information about her specific case. Dr. Thomas testified solely as an expert regarding traumatic stress in children as it relates to sexual abuse by someone they know. She explained that the foundation of this research began in the 1970's,

when Dr. Roland Summit described what he called child sexual abuse accommodation syndrome, or CSAAS. Since Dr. Summit's original publications, others in the field had determined that what he described was not really a syndrome, but rather a description of "the nature of the relationship between sex abuse among an adult and minor known to one another."

Dr. Thomas explained that since most abuse of this nature involves an individual known to the child, the benefit of the research is in understanding the psychological ways in which children cope with such an experience. She explained, "kids are part of a family unit . . . and they're not in control of what's going on. Their objective is to do what's asked of them and to behave in respect to the religious beliefs of the home or other family values and whatnot." Because of this dynamic, they may accommodate the abuse. If they do disclose, it's often a process, and may begin with testing the waters. The response they get may influence whether they continue to disclose. If they do continue to disclose, it will often be piecemeal.

Dr. Thomas explained further that children do not uniformly respond to abuse in the same way. There are five generally accepted areas of concern, or essential components, to consider with respect to the disclosure of sexual abuse by a child, but children do not always demonstrate each component. First and foremost, abusers typically establish secrecy with their victims. They may do this by giving rewards, or by threatening harm to the child or the family. Second, the child may feel a sense of helplessness. They may realize something is not right but feel helpless to say something to do something about it, particularly if they feel dependent upon the abuser. Third, the child becomes entrapped and begins to accommodate the abuse. Fourth, if a child does disclose, it will almost always be a process. And fifth,

10

some children do recant, particularly when they recognize consequences to the family or others because of the disclosure.

On cross-examination, Dr. Thomas reiterated that CSAAS is not actually a syndrome and that the research was not meant to be used as a method to determine if a child had been sexually abused.

## B.     Defense Case

### 1.     T.V.V.

Hammar's first cousin, T.V.V. testified that she lived in the family home with Hammar and Jane for four months.  She said Hammar was not the kind of person who would sexually abuse a young girl, and she never saw anything inappropriate while she was in the home.

### 2.     Hammar's Mother

Hammar's mother testified that she also lived in the family home with Hammar and Jane until 2010.  She had a job at the time and typically came home around 5:30 p.m.  She never saw Hammar do anything that seemed sexually inappropriate with Jane.  He "maybe" yelled or screamed at her when she did not clean the house but that was all she ever saw.  Hammar never hit Jane.

She watched Jane and her sister at the family home after Hammar got arrested.  She never told Jane to drop the charges.  She "was crying and crying and crying" but when she asked Jane about it, Jane had "nothing to say to [her]."  She took "special gifts," mostly clothing, to Jane after Hammar was arrested, but she "always" gave Jane "a lot of stuff."

She admitted taking things from the house at Hammar's request but said it was all guns that were legally registered.

11

### 3. Hammar

Hammar testified in his own defense. He said that he was talking about physical abuse on the pretext call with Jane. He said he spanked her with a bamboo broomstick, slapped her, and made her kneel on tile when she would not listen. Jane would tell him she did not have to listen to him because he was not her real father, and that her mother's family did not like him. He also called her names like stupid, lazy, and dirty. But he testified that he never did anything sexual with her.

He said that his mother removed guns from the house. He had some Playboy magazines in a drawer in the bathroom but no other inappropriate items.

He contacted a lawyer in 2019 to have his arrest record cleared, because he was having trouble getting a job. He had gotten married again in Vietnam, but had been unemployed for a year, so "really need[ed] a job," and thought he could "make good money" in the United States. He traveled to Vietnam in August 2019 and stayed there until his arrest in August 2022. He did not know that there was a hearing for the application to seal his record in September 2019, that new charges had been filed, or that there was a warrant for his arrest. He eventually learned about the warrant but did not think it was a big deal. He was arrested in Vietnam in August 2022, when he went to the U.S. Consulate to renew his passport.

### C. Verdict and Sentencing

The jury found Hammar guilty on each of the 15 asserted counts. The trial court sentenced him to concurrent indeterminate terms of 15 years to life on each of counts 1 through 8, for a total of 120 years to life, plus a combined determinate term of 56 years on counts 9 through 15.

Hammar filed a timely notice of appeal.

## II. DISCUSSION

Hammar raises several related arguments regarding the use of CSAAS testimony at trial. He asserts Dr. Thomas's expert testimony should not have been admitted because it was unreliable; the instruction given to the jury regarding the CSAAS testimony was legally erroneous; and the prosecutor committed misconduct by asking the forensic interviewer, Bowman, questions about the ways in which children tend to disclose sexual abuse.

### A. Admission of Expert Witness Testimony Regarding CSAAS

Hammar first asserts that the trial court erred in permitting expert testimony on CSAAS. He argues the testimony should be rendered inadmissible in the first instance because it is unreliable and almost always supports the conclusion that abuse actually occurred.

### 1. Additional Background

The People asserted in pretrial briefing that CSAAS evidence was both admissible and pertinent "to dispel common misconceptions the jury may hold as to how children react to abuse, for example, when a child delays for a significant amount of time before reporting incidents of child abuse." Here, Jane asserted the abuse started when she was in fifth grade, but she did not disclose it until high school. She initially told her friends not to tell anyone, that she could "handle it," and that they were a "happy family." The People acknowledged that expert testimony on patterns of disclosure must be "restricted to testifying regarding victims' reactions to sexual abuse as a class and not to a particular victim in a specific case."

Hammar filed a motion in limine seeking to exclude CSAAS testimony and, specifically, the testimony of Dr. Thomas, the People's proposed expert. Hammar asserted CSAAS was "predicated on a fallacy and should be excluded." In addition, he argued its probative value was greatly outweighed

by the probability that it would create undue prejudice or mislead the jury. He asserted it was particularly problematic to permit such evidence in this case, because there was no physical evidence, the pretext call was subject to interpretation, and the case therefore came down to credibility. To the extent the trial court did permit the evidence, he argued it should exclude statistical evidence suggesting false accusations are rare and any opinion suggesting Jane was being honest when she reported the abuse.

After hearing argument from defense counsel, the trial court stated that it would permit the People to present expert testimony regarding patterns in the disclosure of sexual abuse by minors. The court explained that the expert testimony would "educate the jury as to why victims of sexual assault may not act in ways that a normal person may find intuitive." The court stated the expert "cannot opine as to whether the false allegations of sexual abuse rarely occur." The prosecutor also agreed that she would not ask the expert to opine as to whether she believed the abuse happened in this case.

### 2. Standard of Review

We review the trial court's admission of expert testimony, including the admission of CSAAS expert testimony, for abuse of discretion. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 (*McAlpin*); *People v. Lapenias* (2021) 67 Cal.App.5th 162, 170 (*Lapenias*).)

### 3. Analysis

Expert witness testimony in the form of an opinion is admissible if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code § 801, subd. (a).) "Like other evidence, expert testimony must be relevant and competent

14

on a material issue, subject to exclusion, however, if unduly prejudicial." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 390 (*Bowker*).)

The extent to which it is appropriate to permit expert testimony concerning CSAAS, or more generally, the ways in which victims tend to disclose sexual assault or abuse, has been addressed in several appellate opinions throughout the years.

In *People v. Bledsoe* (1984) 36 Cal.3d 236 (*Bledsoe*), our high court addressed the admissibility of evidence concerning the closely related topic of rape trauma syndrome, which was, at the time, "a rather recent concept." (*Id*. at pp. 245, 247.) The court began with the general principle, "the admissibility of expert testimony on a given subject must turn both on the nature of the particular evidence and its relation to a question actually at issue in the case." (*Id*. at p. 246.) The court noted that rape trauma evidence could be used in at least two ways: 1) to rebut an inference that a victim is lying based on inconsistencies in their claims; or 2) as a means of proving that the rape occurred. (*Id*. at pp. 247–248.) The prosecution had offered the evidence for the second purpose, and the court concluded, "Given the history, purpose and nature of the rape trauma syndrome concept, . . . expert testimony that a complaining witness suffers from rape trauma syndrome is not admissible to prove that the witness was raped." (*Id*. at p. 251.)

Several years later, another panel of this court considered the admissibility of expert testimony regarding CSAAS in *Bowker*. (*Bowker, supra,* 203 Cal.App.3d at p. 391.) The *Bowker* court noted that the court in *Bledsoe* concluded expert testimony was not admissible to show "a rape had actually occurred," but suggested "evidence related to [rape trauma] syndrome could be admissible to '[disabuse] the jury of some widely held

misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths.' " (*Ibid.*)

Considering the issue in the context of CSAAS, the *Bowker* court explained, "*Bledsoe* must be read to reject the use of CSAAS evidence as a *predictor* of child abuse. It is one thing to say that child abuse victims often exhibit a certain characteristic or that a particular behavior is not inconsistent with a child having been molested. It is quite another to conclude that where a child meets certain criteria, we can predict with a reasonable degree of certainty that he or she has been abused. The former may be appropriate in some circumstances; the latter . . . clearly is not." (*Bowker, supra,* 203 Cal.App.3d at p. 393.)

To balance these competing concerns, the *Bowker* court noted that "several limitations must be observed." (*Bowker, supra,* 203 Cal.App.3d at p. 393.) First, "the evidence must be tailored to the purpose for which it is being received." (*Ibid.*) Second, "the jury must be instructed simply and directly that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true. The jurors must understand that CSAAS research approaches the issue from a perspective opposite to that of a jury. CSAAS *assumes* a molestation has occurred and seeks to describe and explain common reactions of children to the experience. [Citation] The evidence is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*Id* at p. 394.)

A few years later, in *McAlpin, supra,* 53 Cal.3d at p. 1301, the California Supreme Court addressed the admissibility expert testimony regarding a *parent's* failure to report child molestation. The court began with noting its previous conclusion in *Bledsoe* that expert testimony on rape

16

trauma syndrome was "inadmissible when offered to prove that the complaining witness has in fact been raped," but "such testimony is admissible to rehabilitate the complaining witness when the defendant impeaches [their] credibility by suggesting that [their] conduct after the incident—e.g., a delay in reporting—is inconsistent with [their] testimony that [they were] raped." (*Id*. at p. 1300.)

The court then explained: "An even more direct analogy may be drawn to expert testimony on common stress reactions of children who have been sexually molested ('[CSAAS]'), which also may include the child's failure to report, or delay in reporting, the abuse. In a series of decisions the Courts of Appeal have extended to this context both the rule and the exception of [*Bledsoe*]: i.e., expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*McAlpin, supra,* 53 Cal.3d at p. 1300, citing *Bowker*, *supra*, 203 Cal.App.3d at pp. 390–394, among other authorities.)

The court continued, " '[s]uch expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. [¶] The great majority of courts approve such expert rebuttal testimony.' " (*McAlpin, supra,* 53 Cal.3d at p. 1301.) Noting that "[m]ost jurors, fortunately, have been spared the experience of being the parent of a sexually molested child," the court concluded the expert testimony there appropriately assisted the jurors in giving them "information they needed to objectively evaluate [the witness's] credibility." (*Id*. at p. 1302.)

17

Since, other courts have confirmed, while "[e]xpert testimony about CSAAS 'is inadmissible to prove that a child has been abused because the syndrome was developed not to prove abuse but to assist in understanding and treating abused children. [S]uch evidence may be admitted to dispel common misconceptions the jury may hold as to how such children react to abuse.' " (*People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069 (*Mateo*); see also *Lapenias, supra,* 67 Cal.App.5th at p. 171 ["While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse"]; *People v. Munch* (2020) 52 Cal.App.5th 464, 468–473 (*Munch*) [rejecting arguments regarding the admissibility of CSAAS evidence and concluding *McAlpin* "is binding on all lower courts in this state"].)

With these parameters in mind, we find no error in the admission of Dr. Thomas's expert testimony. There is no dispute that Jane's credibility was a central issue in this case. Much of the evidence, and the defense's argument, focused on Jane's prior recantation. As courts have consistently permitted, the People presented testimony from Dr. Thomas solely to dispel the potential inference that Jane was not credible because she delayed reporting the abuse and at one point recanted. Dr. Thomas was careful to explain the limitations of CSAAS. She agreed that CSAAS could not be used to determine if abuse had occurred and clarified she had not received any information or formed any opinions about Jane's case. She explained, consistent with the limitations discussed in the foregoing cases, "it would be inappropriate to say that if a kid kept a secret, and if a kid seemed to have accommodation issues, that they would have been sexually abused. That's not the point; the point is about relationships."

Hammar asserts, somewhat summarily, that CSAAS testimony "cannot possibly be limited to dispelling myths surrounding child sexual abuse" and "the jury cannot possibly avoid using CSAAS to support whatever version of events the victim in any given case describes." We disagree. Here, Dr. Thomas clearly set forth the limitations of CSAAS research and, at no point, did she or anyone else suggest that it should, or could, be used as evidence the abuse actually occurred. This type of evidence has been routinely admitted in such cases, and Hammar does not provide any new evidence or authority to persuade us to deviate from that line of cases.

Hammar relies on several cases from other jurisdictions that have raised similar concerns, or otherwise questioned the usefulness of CSAAS testimony.[3] These cases are not binding on this court, and they do not persuade us to depart from *McAlpin* or the subsequent line of cases holding that expert testimony regarding the disclosure of sexual abuse by children is admissible for the limited purpose of rehabilitation of a victim's credibility. (See *McAlpin, supra,* 53 Cal.3d at pp. 1300–1302; *Mateo, supra,* 243 Cal.App.4th at p. 1069; *Lapenias, supra,* 67 Cal.App.5th at p. 171; *Munch, supra,* 52 Cal.App.5th at pp. 468–473 [addressing and rejecting contrary authority from New Jersey and Kentucky].) While we acknowledge, as other courts have, the inherent tension in allowing such expert testimony for the purpose of dissolving misconceptions about the ways in which children disclose abuse without crossing the line into suggesting that any child that

---

[3]     Hammar only identifies two states that bar CSAAS evidence. At least one of the cases suggests "scientifically reliable [research] recognizes that child victims of sexual abuse may exhibit unexpected behavior patterns seemingly inconsistent with the claim of abuse," and may be admissible if a child's credibility is called into question. (*Steward v. State* (Ind. 1995) 652 N.E.2d 490, 499.)

discloses abuse in a particular way is credible, with appropriate guardrails, we are confident that jurors can decipher the difference.[4]

Hammar contends that regardless of whether expert testimony on CSAAS was helpful to dispel certain misconceptions in the early 1990s, when *McAlpin* was decided, "it is impossible to conclude that . . . the public still holds those misconceptions." He does not specify which misconceptions the public no longer holds, nor does he offer any evidence to support the contention. As Dr. Thomas explained, when CSAAS was first described, it was not commonly understood that child sex abuse is often perpetrated by a family member or close acquaintance. While that point may be better understood today, lay members of the public do not necessarily appreciate the complexities of child psychology and how the relationship with a known abuser may impact the child's response to the abuse. Moreover, to the extent some members of the jury have some understanding of this psychology, the expert testimony remains admissible so long as it would generally assist the jury. (See *McAlpin, supra,* 53 Cal.3d at pp. 1299–1300 ["The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission"].)

Finally, Hammar asserts the admission of CSAAS evidence violated his right to due process, by allowing the jury to improperly infer that because Jane behaved in a manner consistent with other abused children, she was

---

[4] We note that Hammer argues Jane was not credible for many of the reasons discussed by Dr. Thomas, including her delayed disclosure, recantation, and inability to remember details or differentiate one instance of abuse from another. In the absence of the expert testimony, the jury would have been left with an equally improper inference that Jane was *not* credible because of the way she disclosed the abuse. With the admission of the expert testimony, the jury could consider all of the evidence, and make the appropriate credibility determinations.

also abused. For the reasons already discussed, we conclude the admitted evidence did not permit the jury to make such an improper inference, and did not violate Hammar's due process rights. (See *Lapenias, supra,* 67 Cal.App.5th at p. 174 [admission of CSAAS evidence in compliance with rules of evidence does not violate due process].)

For these reasons, we conclude the trial court did not err in admitting expert testimony regarding common patterns in the disclosure of sexual abuse by children as a class.

## B.     Jury Instruction on CSAAS

To the extent we conclude the testimony was admissible, as we do, Hammar asserts the trial court erroneously instructed the jury, pursuant to CALCRIM No. 1193, that it was appropriate to use Dr. Thomas's testimony to conclude Jane's allegations were true.

### 1.     Instruction to the Jury

During the pretrial argument, defense counsel requested a limiting instruction if the court allowed the CSAAS testimony. Later, during trial, the prosecutor provided the court with a copy of CALCRIM No. 1193, "Testimony on Child Sexual Abuse Accommodation Syndrome." The court modified the instruction to insert the names of the expert and the victim. Defense counsel reviewed and approved the instruction as modified. With agreement of the parties, the trial court instructed the jury as follows:

> "You have heard testimony from Dr. Veronica Thomas regarding child sexual abuse accommodation syndrome.

> "Dr. Veronica Thomas' testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him.

> "You may consider this evidence only in deciding whether or not [Jane's] conduct was not inconsistent with the conduct of

someone who has been molested, and in evaluating the believability of her testimony."

## 2. Standard of Review

"We review instructional error claims under a de novo standard of review." (*Lapenias, supra,* 67 Cal.App.5th at p. 175.) "The proper test for judging the adequacy of instructions is to decide whether the trial court 'fully and fairly instructed on the applicable law.' " (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) To do this, we assess the full set of instructions, viewing the challenged instruction in context with the others to determine whether there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner. (*People v. Jennings* (2010) 50 Cal.4th 616, 677.) "We presume that jurors understand and follow the court's instructions." (*People v. Pearson* (2013) 56 Cal.4th 393, 414.)

## 3. Analysis

Hammar asserts the last portion of the CALCRIM No. 1193 instruction is legally erroneous and inconsistent with *Bowker* because it instructed the jurors that it was permissible to use the CSAAS testimony in determining whether to believe Jane.

Numerous courts have rejected this assertion and have, instead, concluded that CALCRIM No. 1193 accurately instructs the jury that they cannot use CSAAS evidence to conclude the alleged victim was in fact abused. (See *Lapenias, supra,* 67 Cal.App.5th at p. 176 ["the official jury instruction accurately instructs the jury on the law: the proper use—and the proper limitations on the use—of CSAAS evidence"]; *Munch, supra,* 52 Cal.App.5th 464, 474 [rejecting contention that CALCRIM No. 1193 will lead the jury to improperly use CSAAS testimony]; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504 (*Gonzales*) ["A reasonable juror would understand CALCRIM

22

No. 1193 to mean . . . it cannot use [the expert's] testimony to conclude [the victim] was, in fact, molested."].)

Hammar points out that *Bowker* suggested the jurors must also understand "that CSAAS research approaches the issue from a perspective opposite to that of a jury. CSAAS *assumes* a molestation has occurred and seeks to describe and explain common reactions of children to the experience." (*Bowker, supra,* 203 Cal.App.3d at p. 394.) He contends the CALJIC No. 10.64 instruction, commonly used before CALCRIM No. 1193, more accurately advises the jury to the nature and relevance of CSAAS evidence in this regard. We note that Hammar did not ask the trial court to include any additional language and conclude the instruction the trial court used was not legally erroneous.

CALJIC No. 10.64 was first published in 1989. The commentary included references to *Bledsoe* and *Bowker*, and the instruction applied to both rape trauma syndrome and CSAAS. (CALJIC No. 10.64 (5th ed. 1988) (Jan. 1990 pocket pt.).) The instruction was amended slightly in 2002. (CALJIC No. 10.64 (6th ed. 1996 (Jul. 2002 pocket pt.).) In its current form, CALJIC No. 10.64 provides:

> "Evidence has been presented to you concerning [child sexual abuse accommodation] [rape-trauma] syndrome. This evidence is not received and must not be considered by you as proof that the alleged victim's [molestation] [rape] claim is true.
>
> "[Child sexual abuse accommodation] [Rape trauma] syndrome research is based upon an approach that is completely different from that which you must take to this case. The syndrome research begins with the assumption that a [molestation] [rape] has occurred, and seeks to describe and explain common reactions of [children] [females] to that experience. As distinguished from that research approach, you are to presume the defendant

23

innocent. The People have the burden of proving guilt beyond a reasonable doubt.]

"You should consider the evidence concerning the syndrome and its effect only for the limited purpose of showing, if it does, that the alleged victim's reactions, as demonstrated by the evidence, are not inconsistent with [him] [her] having been [molested] [raped]."

In August 2005, the Judicial Council adopted CALCRIM as the standard instructions for criminal cases and withdrew its endorsement of CALJIC.[5] CALCRIM No. 1193 was first published in January 2006.

While the CALCRIM and CALJIC instructions begin and end similarly, Hammar observes that the instruction given in this case does not include a statement akin to the middle paragraph of CALJIC No. 10.64, informing the jurors that the research is based on an approach that is essentially the opposite of the approach the jury must take. The CALJIC instruction explains that jurors must presume the defendant did not commit the charged crimes and then analyze the evidence presented to arrive at a verdict, whereas CSAAS researchers worked in the reverse direction. CALCRIM No. 1193 omits this additional explanation.

Although not used in this case, we note that CALCRIM No. 1193 was modified in late 2022. The current CALCRIM No. 1193 model instruction includes the additional statement, "Child sexual abuse accommodation syndrome relates to a pattern of behavior that may be present in child sexual

---

[5] California Courts, California Judicial Branch, Criminal Jury Instructions Resource Center, available at <https://courts.ca.gov/courts/jury-service/resources-judges-attorneys-court-staff-and-public/criminal-jury-instructions>[https://perma.cc/DML2-US9G]; see also (Cal. Rules of Court, rule 2.1050, subd. (a). ["The California jury instructions approved by the Judicial Council are the official instructions for use in the State of California."].)

abuse cases. Testimony as to the accommodation syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse." (Compare Judicial Council of Cal. Criminal Jury Instructions, CALCRIM 2021, pp. 946–947, and Judicial Council of Cal. Criminal Jury Instructions, CALCRIM 2022, pp. 62–63.) While this addition brings CALCRIM No. 1193 somewhat closer to the CALJIC instructions, it does not fully adopt the CALJIC approach.[6]

Here, though, Hammar asked for and agreed to use the CALCRIM No. 1193 instruction. He did not request any modification, and did not request that the court use the CALJIC No. 10.64 instruction instead. As numerous other courts have concluded, CALCRIM No. 1193 is a legally accurate instruction. (See *Lapenias, supra,* 67 Cal.App.5th at p. 176; *Munch, supra,* 52 Cal.App.5th at p. 474; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504.) It informs the jury that they cannot use the CSAAS evidence to conclude the defendant is guilty, and that it should be used instead to determine whether the victim's statement is not inconsistent with someone that has been abused.

Moreover, even if the difference between the CALJIC and CALCRIM versions were significant, we would conclude there was no prejudice as a result. As we have explained, Dr. Thomas provided an in-depth discussion of the origins and limitations of CSAAS testimony. (See *Gonzalez, supra,*

---

[6] The newest version of CALCRIM also replaces the phrase "not inconsistent" with the word "consistent" in the last paragraph. (Compare Judicial Council of California Criminal Jury Instructions, CALCRIM 2021, pp. 946–947, and Judicial Council of Cal. Criminal Jury Instructions, CALCRIM 2022, pp. 62–63.) Because it was not used, and is not raised, in this case, we expressly do not comment on the change from "not inconsistent" to "consistent."

25

15 Cal.App.5th at pp. 503–504 [instruction must be understood in context of expert's testimony].) In the context of that testimony, the instruction given here was adequate to convey the purpose of CSAAS testimony.

In sum, we are persuaded that when considered in tandem with Dr. Thomas's testimony, the CALCRIM instruction offers adequate instruction as to how the jury should use CSAAS testimony. It is not legally erroneous, particularly where, as here, the expert provides an adequate and complete explanation of the history and purpose of CSAAS evidence. Accordingly, we conclude that the trial court did not err by instructing the jury with the version of CALCRIM No. 1193 used here.

## C. Bowman's Testimony

Hammar asserts the prosecutor committed prosecutorial misconduct by asking Bowman questions about CSAAS and related statistics. The People concede this point, but assert the error was not prejudicial.

### 1. Additional Background

As discussed, the trial court granted the People's request to present expert testimony regarding CSAAS. During the associated pretrial argument, defense counsel noted his concern about evidence of "statistical percentages and child abuse—[testimony that] victims of child abuse lying about sexual abuses is exceedingly rare," and provided a citation to *People v. Julian* (2019) 34 Cal.App.5th 878 (*Julian*). (See *id.* at pp. 883, 886 [defendant was deprived of a fair trial by testimony that false allegations of sexual abuse by children occur only in approximately one to eight percent of cases alleging such abuse].) The court asked if the People were planning to offer any evidence of statistics, the prosecutor responded "no," and the court concluded, "then I don't need to rule on that."

26

At trial, Forensic Investigator Bowman testified before Dr. Thomas took the stand. The prosecutor began by asking about Bowman's background. She asked if Bowman had testified "as an expert before," and Bowman said that she had, somewhere between 40 and 60 times. The prosecutor then proceeded to ask Bowman general questions about how she conducts forensic interviews, and the associated professional norms. Bowman mentioned that sometimes children do not want to talk about the abuse during the interview and the prosecutor asked, "How common is that?" Bowman said that it depends on the child and the family dynamic, and that "about 70 percent of kids have accidental disclosures," where someone else finds out about the abuse, but the child is not ready or empowered to speak.

Bowman explained further, "So the not remembering, we call that memory rehearsal. So, if they're not—if they were abused, and they never talk about it, and they also push it down—they don't want to remember. . . . The memory rehearsal weakens over time, so it's not that they're intentionally not remembering." The prosecutor continued with this line of questioning and defense counsel objected as to relevance, improper opinion, and foundation. The court overruled the objections.

Bowman discussed the concept of "reluctancy" and the role of the family dynamic. She said, "a lot of recantation from children happen[s] because there's not support." Defense counsel objected again and on the same grounds. The court struck the statement about recantation but allowed the rest of the testimony. The prosecutor then asked Bowman how common it was that a perpetrator of sexual abuse was a family member. Defense counsel asked for a sidebar, after which the court overruled counsel's objections and stated, "I will consider this a continuing objection." Bowman testified, "About 90 percent of the time, the child knows their perpetrator,

27

whether it be family or a very close friend." She agreed that this gives the perpetrator access to the child, and stated further children without "a supportive maternal caregiver" typically "recant at some point because of that lack of support."

The prosecutor then asked about disclosure. Bowman said it was a process and explained how children disclose in pieces, over time. The prosecutor asked if it is "common for there to be a delay in disclosure," and Bowman said, "that is very common." The prosecutor asked why, and Bowman responded, "fear, shame, sense of responsibility, afraid to dismantle or break up the family system, you know, threatened not to tell." The prosecutor asked about secrecy, and Bowman agreed that was also important for an abuser. The prosecutor also elicited testimony about isolation, entrapment, and helplessness.

During closing argument, the prosecutor referred to Bowman's testimony. She said Bowman talked about Jane's body language and that it was apparent she did not want to discuss the abuse. She argued this was consistent with accidental disclosure. She argued further that Bowman had testified that disclosure is a process, and the fact that Jane did not want to talk about the abuse did not mean that she was lying. She asserted it was common for children "to not encode all memories of molestation or the times and dates of molestation." She concluded, "Bowman's opinion was neutral. She's not an extended arm of law enforcement. And her opinion was based on research and experience."

### 2. Applicable Legal Standards

"It is misconduct for a prosecutor to violate a court ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order." (*People v. Crew* (2003) 31 Cal.4th 822, 839 (*Crew*).) "It is also misconduct for

28

a prosecutor to make remarks in opening statements or closing arguments that refer to evidence determined to be inadmissible in a previous ruling of the trial court." (*Ibid.*) "Because we consider the effect of the prosecutor's action on the defendant, a determination of bad faith or wrongful intent by the prosecutor is not required for a finding of prosecutorial misconduct." (*Ibid.*)

A prosecutor's conduct violates the federal constitution and requires reversal when it infects the trial with such unfairness as to deny the defendant due process. (*People v. Powell* (2018) 6 Cal.5th 136, 172.) If the conduct does not meet the federal standard, it may still require reversal under state law if it employs deceptive or reprehensible methods to attempt to persuade the jury. (*Ibid.*) "[A] determination of bad faith or wrongful intent by the prosecutor is not required for a finding of prosecutorial misconduct." (*Crew, supra,* 31 Cal.4th at p. 839.) "A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*Ibid.*)

### 3. Analysis

The People concede the prosecutor should not have elicited testimony from Bowman regarding the patterns in which children as a class typically disclose sexual abuse. They further assert the statistical testimony at issue was not the type that is normally excluded but agree that it was nevertheless

improper to elicit the testimony based on the prosecutor's prior representation to the court that she would not offer statistics.[7]  We agree.

There is no dispute that Dr. Thomas was the qualified expert on CSAAS.  As a lay witness, Bowman could offer opinion testimony so long as it was rationally based on her own perceptions and helpful to a clear understanding of her testimony.  (See Evid. Code § 800.)  As a forensic interviewer, it was appropriate for Bowman to explain how she goes about conducting an interview, and why she asks certain questions as opposed to others.  She was not, however, permitted to opine on matters such as patterns discussed in scientific research about how children disclose abuse.  That testimony would be permitted only if she were qualified as an expert, and she was not.  (See Evid. Code § 801.)

Bowman crossed the line into CSAAS testimony when she began to talk about concepts such as memory rehearsal.  Moreover, despite defense counsel's objection to the line of questioning as eliciting improper opinion testimony, the prosecutor persisted and elicited additional testimony on essentially all five elements of CSAAS.  This was improper.  (See, e.g., *People v. Smithey* (1999) 20 Cal.4th 936, 960 [misconduct for a prosecutor to continue to elicit inadmissible testimony, particularly after an objection].)

For the same reasons, it was improper for Bowman to testify that about 70 percent of children have accidental disclosures, about 70 percent of

---

[7]     Claims of prosecutorial misconduct are typically forfeited if, as here, the "defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury."  (*Crew, supra,* 31 Cal.4th at p. 839.)  Hammar asserts the claims was preserved because defense counsel did object and was overruled, such that any further objection would have been futile.  He also raises an ineffective assistance of counsel claim.  The People do not raise forfeiture and instead concede there was misconduct.  Accordingly, we will address the merits.

children are reluctant to talk about abuse, and about 90 percent of abuse is perpetrated by someone known to the child. However, we do not find this "statistical" testimony to be as problematic as Hammar suggests. The prosecutor had previously stated she did not intend to offer statistics, but that representation was made in the context of the argument on the motion in limine and defense counsel's citation to *Julian*. The testimony at issue in *Julian* involved statistics about the percentage of false allegations, or conversely, the percent of children who are telling the truth when they report sexual abuse. (*Julian, supra,* 34 Cal.App.5th at p. 886.) This type of testimony is patently problematic because it " ' "conveys a conclusion concerning defendant's legal guilt." ' " (*Id.* at p. 887; see also *People v. Wilson* (2019) 33 Cal.App.5th 559, 568 [concerning percentage of false allegations of sexual abuse].)

Here, Hammar concedes "Bowman did not testify with regard to the percentage of abuse victims who make false allegations." Rather, she testified that most children know their abusers, disclose the abuse inadvertently, and are reluctant to talk about the abuse. The first, that abusers are typically known to the child, is precisely the type of fact that Hammar contends, and which Dr. Thomas confirmed, is now more commonly known to most people. It certainly did not suggest to the jury that Hammar did abuse Jane, just because he was a family member.

The two remaining statistics, regarding accidental disclosure and reluctance, are more closely tied to the components of CSAAS, and may have been problematic from that perspective, but they also do not suggest Jane was credible in the same way that statistics on false reports would. As with the type of CSAAS evidence that is commonly admitted, the assertion that most children are reluctant to disclose abuse does not suggest that reluctant

31

children are therefore necessarily telling the truth; rather, it simply suggests that reluctance is not, itself, an indictor the child is lying. Likewise, the fact that many children disclose abuse accidentally may be helpful in explaining their reluctance to discuss the matter further, but Bowman did not suggest that accidental disclosure is an indicator of truthfulness. Regardless, Jane's disclosures here to her classmates were not accidental. We agree that the prosecutor should not have elicited this type of testimony from Bowman, as opposed to Dr. Thomas, but conclude the testimony itself did not result in an unfair trial in the way that the testimony of false-allegation statistics did in *Julian*.

Regardless, we conclude that any error in the prosecutor's questioning of Bowman on topics related to CSAAS did not rise to the level of reversible error. We acknowledge, as Hammar asserts, one of the key limitations on CSAAS testimony is that the opinions be confined to the class of abuse victims generally, and not the actual victim in the case. (See, e.g., *Bowker, supra,* 203 Cal.App.3d at p. 393.) By allowing Bowman to testify about these characteristics, while also testifying about, and playing the video from, her forensic interview of Jane, there was necessarily some risk the jury would infer that Bowman was talking about Jane specifically, and not the more general class.

However, the testimony elicited from Bowman was minimal, particularly as compared to the subsequent careful and detailed testimony about CSAAS offered by Dr. Thomas. And, with one exception, Bowman did not explicitly connect her more general testimony to Jane or the forensic interview. She spoke in generalities first, and only spoke about the interview with Jane after it was played for the jury. Her testimony at that point was focused primarily on the questions she asked during the interview, and the

32

techniques she was using with Jane. Bowman did state that Jane's reasons for wanting to drop the charges—that she just wanted it to stop and did not really want Hammar to go to prison—were consistent with the known reasons children may recant. In this one instance, Bowman blurred the lines between the general class of victims and Jane, specifically. However, this testimony did not suggest Jane was telling the truth; instead, it suggested Jane's reasons for recanting were not atypical, consistent with the appropriate use of CSAAS testimony.[8] Bowman did not assert, or suggest, at any point that Jane was telling the truth *because* her reaction was similar to that of other abuse victims, or what one might expect from a victim of childhood sexual abuse.

Moreover, we do not view Bowman's testimony in isolation. Dr. Thomas was the primary witness on CSAAS, and her testimony was consistent with the limitations the courts have set on CSAAS. She explained the origins of the research, and its associated limitations. She was extremely careful to explain that the original work was not really a scientific study, that what they initially called a syndrome was not really a syndrome at all, and that she was really describing was the nature of the relationship between a minor and a known adult that is sexually abusing them. She was forthcoming about the criticisms of the research on cross examination and stated, "it would be inappropriate to say that if a kid kept a secret, and if a

---

8      Hammar relies on *People v. Clotfelter* (2021) 65 Cal.App.5th 30 in his reply brief but it is not instructive here. In *Clotfelter*, there was no evidence of delayed reporting or recantation and "the Attorney General concede[d] that the prosecutor's argument was a 'misuse of the CSAAS testimony to the extent it suggests that the victims were actually sexually molested.'" (*Id*. at p. 64.)

33

kid seemed to have accommodation issues, that they would have been sexually abused. That's not the point."

The trial court reiterated this testimony, instructing the jury that testimony regarding CSAAS "is not evidence that the defendant committed any of the crimes charged against him." The limitations of the instruction aside, we presume the jury followed the court's instructions and conclude that there is no reasonable likelihood the jury was misled by the prosecutor's improper questions to Bowman regarding the ways in which children disclose abuse. (See *People v. Mayfield* (1993) 5 Cal.4th 142, 179.)

We reject Hammar's argument that the improper testimony was critical because the case came down to Jane's credibility. There was ample evidence of guilt beyond Jane's own testimony.

First and foremost, there was a pretext call in which Hammar did not deny that he had abused Jane. Instead, he begged her not to tell anyone, promised it would not happen again, and said that is why he had been "trying to stay away from" her. Hammar testified he was only referring to physical abuse, not sexual abuse, but he admitted that he knew why he was being interrogated on October 5, 2011, and he never told Judes about the physical abuse, or that he thought that was the reason Jane was making these accusations. The jury was able to listen to the pretext call and make its own determination about the credibility of Hammar's testimony. That determination was wholly separate from its determination of Jane's credibility.

Likewise, there were several jail calls between Hammar and his mother in which he asked her to remove items from the house and to convince Jane to change her story. Again, Hammar denied that he was asking his mother to persuade Jane to drop the charges, and asserted the only items he asked

her to remove were guns, but the jury was able to make its own determination as to his credibility after hearing the conversations. In making that credibility determination, the jury could also consider other aspects of Hammar's testimony, such as his assertion that his decision to stay in Vietnam from 2019 until his arrest in 2022 had nothing to do with the new charges or the warrant for his arrest. The trial court appropriately instructed the jury that they alone were to judge the credibility and believability of each witness, and explained, "If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says."

On the other hand, there was evidence beyond the CSAAS evidence bolstering Jane's credibility. Jane was consistent in her description of the start of the abuse, and the different types of abuse that occurred. Mother conceded she was concerned enough to place a lock on Jane's door, and Jane's two friends from high school corroborated her story by testifying about their conversations with her closer in time to the abuse.

Hammar asserts the prosecutor compounded the error during closing argument by asserting Jane's demeanor was consistent with someone who was reluctant to disclose. In addition, the prosecutor reiterated that 90 percent of sexual abuse occurs with a family member or friend of the victim, and the family may protect the perpetrator, and asserted that is what happened in this case. She mistakenly stated that Dr. Thomas provided this statistic, but that testimony originated with Bowman. Other than the 90 percent statistic, the prosecutor could have made the same arguments based on Dr. Thomas's testimony, even if Bowman had not testified about the CSAAS topics. Regardless, the focus of the argument was not on the fact that Hammar was a family member, but instead on the allegation that the family,

35

his mother, sought to protect him instead of Jane.  This was fair commentary on the evidence.

Based on the foregoing, we conclude that, although the prosecutor should not have elicited testimony from Bowman about the ways in which children as a class disclose sexual abuse or statistical probabilities of victims' behaviors, the error was not prejudicial and does not require reversal.

### D.    Cumulative Error

Hammar contends the cumulative impact of the alleged errors was prejudicial and requires reversal.  "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) " '[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)

"The 'litmus test' for cumulative error 'is whether [the] defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)  "[T]he reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to [the] defendant in their absence.' " (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)  Where no serious error occurs that, "whether viewed individually or in combination, could possibly have affected the jury's verdict," reversal is not required. (*People v. Martinez* (2003) 31 Cal.4th 673, 704.)

Here, although we agree that the prosecutor improperly discussed concepts related to CSAAS with Bowman, for all the reasons we have already explained, we do not find that it is reasonably probable the jury would have reached a result more favorable result to Hammar in the absence of the

36

improper testimony, either when viewed alone or in connection with the testimony of Dr. Thomas and the instruction under CALCRIM No. 1193. Accordingly, we conclude that the cumulative effect of the error does not require reversal.

## III. DISPOSITION

The judgment is affirmed.

KELETY, J.

I CONCUR:

DATO, Acting P. J.

Do, J., Concurring.

Joseph Anthony Hammar contends CALCRIM No. 1193 does not correctly state the law because it fails to inform the jury, as CALJIC No. 10.64 does, " 'that CSAAS research approaches the issue from a perspective opposite to [a jury;] that CSAAS *assumes* molestation has occurred and seeks to describe and explain common reactions of children to the experience.' " This contention has been persuasively rejected by caselaw. I write separately to make this clear.

In *People v. Gilbert* (1992) 5 Cal.App.4th 1372, the defendant argued the limiting instruction on the use of CSAAS testimony was flawed because it "did not advise the jury that evidence of this kind '*assumes* that a molestation has in fact occurred and that the complaining witnesses['] reactions were common explanations of a factual event.' " (*Id.* at p. 1387.) The court in *Gilbert* rejected the argument, explaining that it was "based on explanatory language, in *Bowker,* which in [its] view was patently intended to make the opinion clear to the attorney or judge who read it and not to be incorporated (at least in the unelaborated form [defendant] suggests) in an instruction to the jury." (*Gilbert,* at p. 1387 [referring to *People v. Bowker* (1988) 203 Cal.App.3d 385].) Finding, as the majority does here, that "[t]he instructions the trial court gave were clear, accurate, and sufficient," the court in *Gilbert* stated it was "unnecessary, and potentially confusing and misleading, to add the language" from *Bowker*. (*Ibid.*)

I agree with *Gilbert* and note the danger inherent in simply incorporating language taken from an appellate opinion into a jury instruction. "[J]udicial opinions are not written as jury instructions and may be notoriously unreliable as such." (*Delos v. Farmers Group, Inc.* (1979) 93 Cal.App.3d 642, 656; see *Francis v. City and County of San Francisco* (1955)

1

44 Cal.2d 335, 341 ["it is dangerous to frame an instruction upon isolated extracts from the opinions of the court"].)  I would reject Hammar's claim of instructional error on this additional ground.

DO, J.